JUDGE FORREST

UNITED STATED DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

13 CV 4559

------------------------------------------------------------- X

MARIA D. RIVERA

                                 Plaintiff,

              – against –

BANK OF AMERICA, N.A.,

                               Defendant.

------------------------------------------------------------- X

Index No.:

**COMPLAINT
AND
JURY DEMAND**

RECEIVED
JUL 0 1 2013
U.S.D.C. S.D.N.Y.
CASHIERS

       Plaintiff MARIA D. RIVERA ("Ms. Rivera"), by her attorneys, CAMBA Legal Services and Bromberg Law Office, P.C., as and for her complaint against Defendant BANK OF AMERICA, N.A. ("BOFA"), alleges as follows:

**PRELIMINARY STATEMENT**

       1.     Plaintiff brings this action against BOFA, the Defendant, for damages arising out of BOFA's violations of the Electronic Funds Transfer Act, 15 U.S.C. § 1693 *et seq.* ("EFTA") and the rules and regulations thereunder; the Truth in Lending Act, 15 U.S.C. § 1601 *et seq.* ("TILA") and the rules and regulations thereunder; and state common law.

       2.     In brief, from May 2012 to August 2012 Ms. Rivera suffered four periods of fraudulent activity on her BOFA credit card and bank accounts. The first and second period

-1-

expose the history of fraud associated with Ms. Rivera's BOFA credit and bank accounts. The third and fourth periods lay the ground-work for the causes of action asserted in this complaint.

3. The third period of fraudulent activity took place between July 2 and July 5, 2012. Within that time-frame, an unknown thief or thieves made seven unauthorized and fraudulent online banking cash advances from Ms. Rivera's BOFA Visa Signature credit card to Ms. Rivera's BOFA bank account, totaling $1,631.80. For each transaction, BOFA assessed a 5% transfer fee. During the same period, the unknown thief or thieves made ten unauthorized and fraudulent ATM withdrawals from Ms. Rivera's BOFA bank account, totaling $1,615.49. For each transaction, BOFA assessed a two dollar ATM fee. Ms. Rivera noticed the unauthorized transfers and withdrawals on her June 17, 2012 to July 16, 2012 billing statement and immediately reported them to BOFA.

4. The fourth period of fraudulent activity took place between July 18 and July 22, 2013. Within that time-frame, an unknown thief or thieves made seven unauthorized and fraudulent charges on Ms. Rivera's BOFA credit card, totaling $546.44. Ms. Rivera noticed the unauthorized charges on her July 18, 2012 to August 16, 2012 billing statement and immediately reported them to BOFA.

5. In reporting and disputing the fraudulent transfers, withdrawals, and charges on her accounts, Ms. Rivera diligently complied with all statutory requirements as well as all of BOFA's requests. Nonetheless, after allegedly conducting an "investigation," BOFA, ignoring the facts and governing law, rejected Ms. Rivera's complaints, ignored Ms. Rivera's requests for further investigation of her claims, and charged Ms. Rivera's accounts for the full amount of the fraudulent transfers, withdrawals, fees, and charges. Thereafter, BOFA, in direct violation of

-2-

Federal law and its own policies, repeatedly failed to give Ms. Rivera a rational justification for rejecting the dispute or provide the documents it supposedly relied upon in its "investigation." As a result of the fraudulent activity, BOFA charged Ms. Rivera a total of $2,308.46 – representing $1,631.80 in unlawful online advances and withdrawals and $546.44 in fraudulent purchases plus $130.22 in transfer fees, interest fees, and ATM fees.

## THE PARTIES

6.      Ms. Rivera, the Plaintiff, is 48 years of age and resides at 2427 Webster Avenue, Apartment B9, Bronx, NY 10458.  Her prior address was 975 181st Street, Apt. 1A, Bronx, NY 10460. She moved from 181st Street to Webster Street because the fraudulent activity described in this complaint made her feel that the 181st Street address was insecure.

7.      Ms. Rivera makes her living as a home attendant and makes about $1,000 per month.

8.      Ms. Rivera is a "consumer", as the term is defined by 15 U.S.C. § 1693a(6) of the EFTA and Regulation E, 12 C.F.R. § 205.2, because she is a natural person who has an account held by a financial institution and who was issued an access device by that financial institution and entered into an agreement for the provision of electronic fund transfer services with that financial institution.

9.      Ms. Rivera is a "consumer", as that term is defined by 15 U.S.C. §§ 1602(i), (n) of TILA, because this complaint arises from the bank's offer and extension of credit to Ms. Rivera, a natural person and credit card holder, for personal, family or household purposes.

-3-

10. Defendant, BOFA, is a national banking association with branches all around the New York metropolitan area, including a branch at 248 East Fordham Road, Bronx, NY 10458.

11. BOFA is a "creditor", as that term is defined by 15 U.S.C. § 1602(f) of TILA and Regulation Z, 12 C.F.R. § 226.2(a)(17) and 12 C.F.R. § 1026.2(a)(17) because at all relevant times, BOFA, in the ordinary course of its business, regularly – i.e., more than 25 times per year – extended consumer credit for which a finance charge is or may be imposed, which is payable in more than four installments and because it is a card issuer, whether or not the amount due is payable by agreement in more than four installments or the payment of a finance charge is or may be required.

12. BOFA is a "financial institution", as the term is defined by 15 U.S.C. § 1693a(9) of the EFTA and Regulation E, 12 C.F.R. § 205.2(i) because it is a national bank and directly or indirectly holds an account belonging to a consumer or issues an access device and agrees with a consumer to provide electronic fund transfer services.

## JURISDICTION AND VENUE

13. This action arises under the Electronic Funds Transfer Act, 15 U.S.C. §1693 *et seq.*, and the rules and regulations thereunder, and the Truth in Lending Act, 15 U.S.C. § 1601 *et seq.*, and the rules and regulations thereunder. Title 15 U.S.C. § 1693m(g) provides that civil actions brought under the EFTA may be commenced in any United States District Court without regard to the amount in controversy. Title 15 U.S.C. § 1640(e) also provides that civil actions brought under TILA may be commenced in any United States District Court. The district courts have supplemental jurisdiction over Ms. Rivera's New York State common law claims because

-4-

they are "so related to claims in the action within such original jurisdiction that they form part of the same case or controversy." See 28 U.S.C. § 1367(a).

14.     BOFA does business at its branch located at 248 East Fordham Road, Bronx, NY 10458, in the Southern District of New York, and, accordingly, venue is proper in this district pursuant to 28 U.S.C. § 1391(c).

## FACTS

15.     In February or March 2012, Ms. Rivera learned that BOFA was offering a credit card with a 0% interest rate for one year. At the time, Ms. Rivera had a Discover card with a high interest rate and decided that transferring her Discover card's balance to a BOFA card with no interest rate would make economic sense. As such, Ms. Rivera went to her local BOFA branch at 248 East Fordham Road, Bronx, NY 10458 and applied for a BOFA credit card. Ms. Rivera was assisted by a BOFA employee who she believes is named Carol or Carmen ("Carol").

16.     In March or April 2012, Ms. Rivera was approved for a BOFA credit card. BOFA issued Ms. Rivera a new Visa Signature card (ending in 1036) with a credit limit of $5,000.00.

17.     Once Ms. Rivera became a BOFA customer, BOFA employee Carol helped Ms. Rivera transfer her debt from her Discover card to the BOFA credit card. BOFA satisfied Ms. Rivera's outstanding Discover card debt, totaling $2,152.00, and charged Ms. Rivera $86.08 in transfer fees.

18.     While Carol was helping Ms. Rivera transfer her Discover card balance, Carol asked Ms. Rivera if she would like to open a BOFA bank account. Ms. Riverasaid that she had

no interest in opening a bank account because she already banked with Chase. Carol, however, stressed the convenience a BOFA bank account would provide Ms. Rivera in attending to her BOFA credit card and urged Ms. Rivera to open up a bank account. After much pressure, Ms. Rivera opened a BOFA bank account with a minimum balance of $25.00.

19.     The BOFA bank account (ending in 2248) was opened on or about May 8, 2012.

20.     An ATM card was provided in conjunction with the opening of Ms. Rivera's bank account.

21.     From the time Ms. Rivera opened her bank account in May 2012 up until the present, Ms. Rivera has only ever made withdrawals from her BOFA bank account from the ATMs inside the BOFA branch located at 248 East Fordham Road, Bronx, NY 10458. In other words, Ms. Rivera has never withdrawn money from her BOFA bank account from non-BOFA ATMS, or even BOFA ATMS at a different location. From the time Ms. Rivera opened her credit card and bank accounts in March or April 2012 up until the present, Ms. Rivera's credit and ATM cards were never lost or stolen, nor has she ever loaned or given them to any other person. Ms. Rivera has never given anyone authorization to use her BOFA credit or ATM card. She has never shared, lost, or revealed her pin numbers or other authorization information. Furthermore, she does not keep her pin or authorization information on or with her cards.

22.     Despite Ms. Rivera's diligent efforts to keep her financial information secure, over the next four months (May 2012 – August 2012) Ms. Rivera's BOFA credit and bank accounts would be fraudulently accessed at least twenty-four (24) times.

23.     The events are most profitably discussed by grouping them into four periods of fraud. The first and second period expose the history of fraud associated with Ms. Rivera's

-6-

BOFA credit and bank accounts. The third and fourth periods lay the ground-work for the causes of action asserted in this complaint.

### The First Period of Fraudulent Activity on Ms. Rivera's BOFA Accounts.

24.     In May 2012, Ms. Rivera received her April 17, 2012 to May 16, 2012 credit card statement for her BOFA card ending in 1036. When Ms. Rivera reviewed this statement she noticed fraudulent cell phone charges and immediately called BOFA and made a fraud report.

25.     On or about June 2012, Ms. Rivera received a new credit card ending in 6474 because of the fraudulent charges. She also received a credit for the fraudulent cell phone charges.

### The Second Period of Fraudulent Activity on Ms. Rivera's BOFA Accounts.

26.     In June 2012, Ms. Rivera received her May 17, 2012 to June 16, 2012 credit card statement and noticed charges for $177.39 that were made on May 17, 2012 payable to "CABLEVISION." Ms. Rivera did not recognize these charges, and immediately called the BOFA number on the back of her credit card to explain that there was a fraudulent charge on her new card. The BOFA representative on the phone told her not to worry about the fraudulent charge, that she was not liable for the charge, and that BOFA would investigate. Ms. Rivera later received a credit for the $177.39 charge.

### *The Third Period of Fraudulent Activity on Ms. Rivera's BOFA Accounts.*

27.     On or about July 2, 2012, without Ms. Rivera's knowledge, three unauthorized

and fraudulent online banking cash advances were made from Ms. Rivera's new BOFA credit

card (ending in 6474) to Ms. Rivera's BOFA bank account (ending in 2248):

> Advance # 3018055355 was for $500.00.

> Advance # 0625846481 was for $209.99.

> Advance # 3725236746 was for $200.00.

BOFA assessed 5% transfer fees for each transaction.

28.     On July 2, 2012, without Ms. Rivera's knowledge, six unauthorized and

fraudulent ATM withdrawals were made from Ms. Rivera's BOFA bank account (ending in

2248) at ATMs Ms. Rivera does not use[1]:

> Withdrawal # 000163650 was for $201.75.

> Withdrawal # 000163883 was for $201.75.

> Withdrawal # 000262208 was for $201.60.

> Withdrawal # 000263366 was for $101.60.

> Withdrawal # 000307157 was for $101.50.

> Withdrawal # 000308756 was for $101.50.

BOFA assessed a two dollar ATM fee for each transaction.

---

[1] The withdrawals were done at ATMs operated by or in several Bronx "bodegas". "Bodegas" are small, privately run corner stores found throughout the New York City metropolitan area.

29.     On July 3, 2012, without Ms. Rivera's knowledge, another unauthorized and fraudulent online banking cash advance was made from Ms. Rivera's BOFA credit card (ending in 6474) to Ms. Rivera's BOFA bank account (ending in 2248):

Advance #0333430239 was for $15.55.

BOFA assessed a 5% transfer fee for this transaction.

30.     On July 5, 2012, without Ms. Rivera's knowledge, three more unauthorized and fraudulent online banking cash advances were made from Ms. Rivera's BOFA credit card (ending in 6474) to Ms. Rivera's BOFA bank account (ending in 2248):

Advance # 3040539238 was for $302.02.

Advance # 3743783626 was for $202.22.

Advance # 3750952541 was for $202.02.

BOFA assessed 5% transfer fees for each transaction.

31.     On July 5, 2012, without Ms. Rivera's knowledge, four unauthorized and fraudulent ATM withdrawals were made from Ms. Rivera's BOFA bank account (ending in 2248) at ATMs Ms. Rivera does not use[2]:

Withdrawal # 000473067 was for $201.60.

Withdrawal # 000537669 was for $201.60.

Withdrawal # 000503641 was for $200.99.

Withdrawal # 000473364 was for $101.60.

BOFA assessed a two dollar ATM fee for each transaction.

---

[2] The withdrawals were done at ATMs operated by or in several Bronx "bodegas". "Bodegas" are small, privately run corner stores found throughout the New York City metropolitan area.

32.     In early July 2012, Ms. Rivera called BOFA's automated system to check the balance on her BOFA credit card. She learned that her balance was over $4,000, which surprised her because she believed that her balance was roughly $2,000. She immediately contacted BOFA and advised them that there must have been a mistake, as she could not have a balance of $4,000. BOFA advised her to highlight any fraudulent charges she does not recognize on her next account statement. BOFA also told her not to worry about the fraudulent charges, that she is not liable for the charges, and that BOFA would investigate.

33.     On or about July 17, 2012, Ms. Rivera received the June 17, 2012 to July 17, 2012 account statement for her BOFA credit card (ending in 6474). The statement included a $1,631.80 cash advance, a $90.80 fee, and a $17.42 interest fee. When she saw the advance and associated fees, Ms. Rivera immediately went to her BOFA branch to speak with Carol, the BOFA employee who had helped her open her accounts. With Carol's help, Ms. Rivera filed a fraud dispute over the phone.

34.     On July 28, 2012, BOFA responded to Ms. Rivera's fraud dispute by a letter on FIA Card Services' letterhead. In the letter, Ms. Rivera was asked to complete Fraud Declaration Forms. Ms. Rivera completed the requested forms with the help of BOFA branch employee Carol and faxed the documents back to BOFA.

35.     On or about August 2012, because of the fraudulent activity on her account, BOFA issued Ms. Rivera a new credit card (account ending in 0895).

36.     On or about August 9, 2012, Ms. Rivera's BOFA bank account (ending in 2248) was temporarily credited $1,615.49.

-10-

37.     On or about August 10, 2012 BOFA temporarily reversed $20 dollars in ATM transaction fees and a $2.00 balance inquiry fee.

### The Fourth Period of Fraudulent Activity on Ms. Rivera's BOFA Accounts.

38.     On or about August 2012, Ms. Rivera received the July 18, 2012 to August 16, 2012 credit card statement for her new BOFA credit card.  Despite her new credit card, Ms. Rivera's July 18, 2012 to August 16, 2012 credit card statement included $546.44 of fraudulent charges at stores Ms. Rivera does not frequent, including BON BINI INC, H&M, AAA, 2510 VALENTINE AVE INC, THE CHILDREN'S PLACE, FOREVER [21], and ALDO US. Upon receiving the statement, Ms. Rivera quickly informed BOFA of the fraudulent charges and, on BOFA's advice, went to her local police precinct and filed a report.

39.     On August 23, 2012, Ms. Rivera filed a police report with Officer Camarena Rance (shield # 2852) of the 48th Precinct of the New York City Police Department.  Officer Rance filed Complaint # 2012-048-06291 in response to Ms. Rivera's report.  When Ms. Rivera discovered the fraudulent charges on her July 18, 2012 to August 16, 2012 credit card statement, she went back to the police station to report identity theft, but was told she could not file a second police report.  However, Officer Roque (#23783) gave Ms. Rivera his phone number and told her that BOFA could contact him with any questions.

### Ms. Rivera's Ongoing Efforts to Resolve Her Fraud Disputes.

40.     On or about January 15, 2013, Ms. Rivera went to her local bank branch at 248 East Fordham Road, Bronx, NY 10458 and presented the police report (Complaint # 2012-048-

06291) to BOFA representative Jade Jaffry. Ms. Jaffry faxed the police report (Complaint # 2012-048-06291) to BOFA's fraud department with a note forwarding Officer Roque's contact information and advising the fraud department that Officer Roque was open to being contacted by the bank about the case.

41. From September 12, 2013 through September 29, 2012, Ms. Rivera traveled to the Dominican Republic to visit her family. Prior to leaving for her trip, Ms. Rivera contacted BOFA, notified BOFA that she would be out of the country, and provided BOFA with her phone numbers in the Dominican Republic. Ms. Rivera was not contacted by BOFA in the Dominican Republic.

42. When Ms. Rivera returned from the Dominican Republic, she found a letter from BOFA, dated September 27, 2013. After reading the letter, Ms. Rivera immediately called BOFA. The letter claimed that BOFA had tried to reach her and advised her to contact BOFA. (Ms. Rivera denies that BOFA attempted to contact her at any time during her trip since they knew where she was and had her contact information.) Upon contacting BOFA, Ms. Rivera was told that there was nothing further that they needed, and that BOFA would soon contact her regarding her fraud claims.

43. On or about September 13, 2012, BOFA sent Ms. Rivera a letter denying her fraud claims for the July 2 – July 5 transactions and advising her that the temporary credit for $1,615.49 would be reversed and corresponding fees re-billed on September 21, 2012.

44. On or about September 21, 2012, BOFA deducted $1,615.49 from Ms. Rivera's BOFA bank account (ending in 2248). On or about September 26, 2012, BOFA deducted $22.00 in fee re-bills from Ms. Rivera's BOFA bank account (ending in 2248).

-12-

45. On or about October 3, 2012, BOFA sent Ms. Rivera two letters. Both letters informed Ms. Rivera that after "thorough" investigations, BOFA had determined that the funds from the July 2 – July 5 transactions were credited to her legitimate bank account and that she benefited from the balance transfers. Ms. Rivera was also told that she would be responsible for the balance on the account in accordance with her Account Agreement.

46. On or about October 13, 2012, BOFA sent Ms. Rivera a letter regarding the $546.44 in fraudulent charges on Ms. Rivera's credit card (account ending in 0895). This letter stated, "we have researched your claim and we have issued a credit(s) to your account for the fraudulent charge(s) that posted between 7/19/2012 and 7/23/2012, excluding transactions that you were notified of in previous correspondence." However, no money was ever credited to Ms. Rivera's account for the fraudulent charges.

47. From October 2012 to January 2013, Ms. Rivera consistently asked BOFA for information about its investigations and consistently asked BOFA to reinvestigate.

48. BOFA failed to provide any substantive information regarding the investigation of Ms. Rivera's fraud claims or take substantive action on the information provided by Ms. Rivera throughout this ordeal.

49. On November 7, 2012, December 14, 2012, and January 15, 2013, BOFA issued letters to Ms. Rivera claiming that they had "been unsuccessful in our attempts to contact you" and advising Ms. Rivera to "Please contact us at 1.866.400.4005 in order for us to expedite your claim." Ms. Rivera always complied with these letters and contacted BOFA immediately after receiving any communication from them.

-13-

50.     BOFA denied Ms. Rivera's requests for documentation about BOFA's investigation.  On November 27, 2013, BOFA issued a letter stating that Ms. Rivera had "requested a photocopy of" several of the fraudulent online banking cash advances and explaining that "the item(s) requested is an electronic transaction so no photocopy is available." On the same date, BOFA issued a second letter stating that Ms. Rivera had "requested a photocopy of" a transaction in the amount of $200.00, with a "Posted Date" of "11/26/2012." The letter explained that the item could not be located because "the account was closed on 11/06/2012."

51.     In response to Ms. Rivera's requests to re-investigate, BOFA issued cursory letters on December 24, 2012 and January 4, 2013 which stated that "our original determination was correct" and "no fraud has occurred."  These letters offered no justification for rejecting Ms. Rivera's dispute.

52.     In conducting its alleged "investigation," BOFA ignored the overwhelming evidence that Ms. Rivera did not authorize these transfers and withdrawals, including: the history of fraud associated with Ms. Rivera's BOFA credit cards, BOFA's own suspicion of identity theft, Ms. Rivera's filing of an identity theft complaint with the police, Ms. Rivera's determination to have her fraud claims investigated, the evident and uncharacteristic pattern of online cash advance transfers from Ms. Rivera's BOFA credit card (ending in 6474) to her bank account (ending in 2248), and the evident and uncharacteristic pattern of fraudulent ATM withdrawals from non-BOFA branch locations.

53.     Despite the overwhelming evidence of fraud, BOFA assumed, upon information and belief, that Ms. Rivera must be deemed, as a matter of law, to have authorized the cash advances, transfers, withdrawals, and charges.

54.     In January 2013, after BOFA repeatedly denied Ms. Rivera's fraud claims, Ms. Rivera contacted NEDAP (Neighborhood Economic Development Advocacy Project)[3], a nonprofit organization located at 176 Grand Street, Suite 300, New York, NY 10013.  Per the good advice of NEDAP's staff, Ms. Rivera closed her bank account.

55.     On January 30, 2013, BOFA issued Ms. Rivera a letter confirming that her BOFA bank account (ending in 2169) had been closed.

56.     On June 19, 2013, Ms. Rivera became a client of CAMBA Legal Services, Inc.

57.     On June 20, 2013, on Ms. Rivera's behalf, Ricardo N. Avila, Esq. of CAMBA Legal Services, Inc. sent a letter to BOFA requesting the return of $2,308.46 – representing $1,631.80 in unlawful online advances and withdrawals and $546.44 in fraudulent purchases plus $130.22 in transfer fees, interest fees, and ATM fees. The letter was sent in an effort to resolve the matter without the necessity of court action.  This request was ignored with no response whatsoever from BOFA.

58.     Ms. Rivera has not paid BOFA for the fraudulent charges, but she has paid in full all other money which she owes to BOFA.  To-date, Ms. Rivera owes a balance of $2,308.46 to BOFA, and this balance is still accruing interest.

59.     The fraudulent activity on Ms. Rivera's BOFA accounts, BOFA's repeated denial of Ms. Rivera's fraud claims, BOFA's repeated refusal to conduct a reasonable investigation of

---

[3] NEDAP is now or will soon be "New Economy Project".

the fraudulent activity, and BOFA's repeated refusal to provide Ms. Rivera with documentation or information supporting its denial of her claims, have caused Ms. Rivera great emotional distress. Ms. Rivera's experience with her BOFA accounts has been so traumatic, in fact, that she had to begin taking sleeping pills as a result of the aforementioned events.

60.    In summary, BOFA failed to comply with its legal obligation to conduct an investigation of Ms. Rivera's fraud claims and also failed to provide Ms. Rivera with documentation regarding the investigation or a justification for its denial of Ms. Rivera's fraud claims, even after Ms. Rivera consistently asked BOFA for that information.

61.    After rejecting Ms. Rivera's claim that the electronic transfers, withdrawals, charges, and payments that had occurred on Ms. Rivera's accounts from July 2012 to August 2012 were fraudulent and unauthorized, BOFA proceeded to charge Ms. Rivera for the fraudulent activity, totaling $2,308.46. Ms. Rivera also experienced emotional distress and other damages in an amount to be determined at trial.

## LEGAL FRAMEWORK

62.    Plaintiff has causes of action under the Electronic Funds Transfer Act and the rules and regulations thereunder, the Truth in Lending Act and the rules and regulations thereunder, and New York State common law.

*Electronic Funds Transfer Act*

63.    The Electronic Funds Transfer Act of 1978, 15 U.S.C. § 1693 et seq., is intended

to protect individual consumers engaging in electronic fund transfers.  See § 1693(b) ("The

primary objective of this subchapter [...] is the provision of individual consumer rights.")

64.    An "unauthorized electronic fund transfer" is defined in the EFTA as "an

electronic fund transfer from a consumer's account initiated by a person other than the consumer

without actual authority to initiate such transfer and from which the consumer receives no

benefit", § 1693a(12), except for an electronic transfer "(A) initiated by a person other than the

consumer who was furnished with the card, code, or other means of access to such consumer's

account by such consumer, unless the consumer has notified the financial institution involved

that transfers by such other person are no longer authorized, (B) initiated with fraudulent intent

by the consumer or any person acting in concert with the consumer, or (C) which constitutes an

error committed by a financial institution." *Id.*

65.    In regard to the EFTA, the term "unauthorized electronic fund transfer" includes a

transfer which is initiated by someone who obtained the access devise from the consumer

through fraud or robbery.  12 C.F.R. § 205.2(m), Supp. I (Official Staff Interpretation on

§205.2(m)(3), (4).

66.    An "access device" is defined in the EFTA as "a card, code, or other means of

access to a consumer's account, or any combination thereof, that may be used by the consumer to

initiate electronic fund transfers."  12 C.F.R. § 205.2(a)(1).

67.    An "access device" becomes and "accepted access device" when the consumer

"Requests and receives, or signs, or uses (or authorizes another to use) the access device to

-17-

transfer money between accounts or to obtain money property, or services […]". 12 C.F.R. §
205.2(a)(2)(i).

68.     A financial institution is required to investigate consumers' claims of error,
determine whether an error has occurred, and report or mail the results of such investigation and
determination to the consumer within ten days. 15 U.S.C. § 1693f(a).

69.     If a bank decides to deny a claim of error, it must explain its findings and, upon
the consumer's request, provide the consumer with copies of the documents it relied upon in its
investigation to conclude that an error did not occur. 15 U.S.C. § 1693f(d); 12 C.F.R.
§ 205.11(d).

70.     If a consumer reports to her bank that an unauthorized electronic funds transfer
has occurred through use of a bank debit card, the consumer's liability for the unauthorized
transfer is limited to $50 if it is reported to the bank within two business days after the consumer
learns of the loss. 15 USC § 1693g(a).

71.     Under the EFTA a consumer has no liability when an unauthorized transfer
appears on the consumer's monthly statement and is reported by the consumer to the financial
institution within sixty days or when an unauthorized transfer does not involve an accepted
access device or when the financial institution has not provided a means to identify the
consumer. 12 C.F.R. § 205.6(b)(3).

72.     The federal regulations promulgated pursuant to EFTA § 1693b are found in Part
205 of Subchapter A of Chapter II of Title 12 of the Code of Federal Regulations and are known
as "Regulation E". See 12 C.F.R. § 205.1(a). The stated purpose of these federal regulations is

-18-

to carry out the purposes of the EFTA, the primary objective of which "is the protection of individual consumers engaging in electronic fund transfers." 12 C.F.R. § 205.1(b).

73.    Consumers may recover actual damages under the EFTA, 15 U.S.C. § 1693m(a)(1), plus an additional sum of from $100 to $1000, § 1693m(a)(2)(A), plus the costs of the action and a reasonable attorney's fee, § 1693m(a)(3). Treble damages may also be awarded if the court finds that a financial institution "did not have a reasonable basis for believing that the consumer's account is not in error." § 1693f(e).

### Truth in Lending Act

74.    The Truth in Lending Act of 1968, 15 U.S.C. § 1601 et seq., amended by the Fair Credit Billing Act of 1975, is intended to promote the informed use of consumer credit and seeks to "protect the consumer against inaccurate and unfair credit billing and credit card practices." 15 U.S.C. § 1601(a).

75.    The term "unauthorized use" is defined in TILA as "a use of a credit card by a person other than the cardholder who does not have actual, implied, or apparent authority for such use and from which the cardholder receives no benefit." § 1602(p).

76.    Under TILA, the consumer cannot be held liable for unauthorized use of a credit card in excess of $50, provided that the consumer promptly notifies the card issuer of the unauthorized use. § 1643(d).

77.    The federal regulations promulgated pursuant to TILA § 1604 are found in Part 226 of Subchapter A of Chapter II of Title 12 of the Code of Federal Regulations and are known

as "Regulation Z." See 12 C.F.R. § 226.1(a). The stated purpose of these federal regulations is to carry out the purposes of TILA. Id.

78.     Upon receipt of written notification from an obligor that a credit statement contains a billing error, a creditor is required to send a written acknowledgement thereof to the obligor not later than thirty days after the receipt of the notice. 15 U.S.C. § 1666(a)(A). Further, no later than two complete billing cycles after the receipt of the notice, the creditor is required to either make appropriate corrections in the account of the obligor or "send a written explanation or clarification to the obligor, after having conducted an investigation, setting forth to the extent applicable the reasons why the creditor believes the account of the obligor was correctly shown in the statement, and, upon request of the obligor, provide copies of documentary evidence of the obligor's indebtedness." 15 U.S.C. § 1666(a)(B).

79.     Unauthorized use of a credit card is a type of billing error. 12 C.F.R. § 226.13(a)(1).

80.     "If, after conducting a reasonable investigation, a creditor determines that no billing error occurred or that a different billing error occurred from that asserted," the creditor shall "mail or deliver to the consumer an explanation that sets forth the reasons for the creditor's belief that the billing error alleged by the consumer is incorrect in whole or in part." 12 C.F.R § 226.13(f)(1). An ambiguous and cursory statement that does not set forth a legitimate justification for rejecting the dispute is insufficient. Dillard Dep't Stores, Inc. v. Owens, 951 S.W.2d 915, 918 (Tex. App. Ct. 1997).

81.     Further, if the consumer requests copies of documentary evidence of the consumer's indebtedness, the creditor must provide them. 12 C.F.R § 226.13(f)(2).

82.     Consumers may recover actual damages under TILA, 15 U.S.C. § 1640(a)(1),

plus "twice the amount of any finance charge in connection with the transaction, with a

minimum of $500 and a maximum of $5,000, or such higher amount as may be appropriate in

the case of an established pattern or practice of such failures," § 1640(a)(2)(A)(iii), plus the

costs of the action and a reasonable attorney's fee, § 1640(a)(3).

**FIRST CLAIM FOR RELIEF**
(Electronic Fund Transfer Act, 15 U.S.C. § 1693 *et seq.*)

83.     Plaintiff repeats and re-alleges each and every allegation contained in the

foregoing paragraphs with the same force and effect as though fully set forth herein..

84.     This claim arises under the Electronic Fund Transfer Act (EFTA) and Regulation

E because it relates to unauthorized and fraudulent electronic transfers from and between Ms.

Rivera's BOFA accounts.

85.     Defendant violated the EFTA and Regulation E.  Defendant's violations include,

but are not limited to: failing to conduct an investigation of Ms. Rivera's claims of error; failing

to provide Ms. Rivera with an explanation for Defendant's denial of Ms. Rivera's fraud claims;

and failing to provide Ms. Rivera with documentation regarding Defendant's denial of Ms.

Rivera's fraud claims, even after Ms. Rivera requested the same.  These actions are in violation

of 15 U.S.C. §§ 1693f, 1693g and 12 C.F.R. §§ 205.6, 205.11.

86.     As a direct and proximate result of Defendant's violations of EFTA and

Regulation E, Plaintiff has sustained actual damages equal to at least $2,308.46 – representing

$1,631.80 in unlawful online advances and withdrawals and $546.44 in fraudulent purchases

plus $130.22 in transfer fees, interest fees, and ATM fees – plus such other damages as may be

determined by the court.  Ms. Rivera is entitled to recover actual damages under the EFTA, §

1693m(a)(1), plus an additional sum of from $100 to $1000, 15 U.S.C. § 1693m(a)(2)(A), plus

the costs of the action and a reasonable attorney's fee, § 1693m(a)(3).

87.     Because BOFA lacked a reasonable basis for believing denying Ms. Rivera's

fraud claims, Ms. Rivera is also entitled to recover treble damages, which amount to at least

$6,925.38.  See § 1693f(e).

## SECOND CLAIM FOR RELIEF
(Truth in Lending Act, 15 USC § 1601 et seq.)

88.     Plaintiff repeats and re-alleges each and every allegation contained in the

foregoing paragraphs with the same force and effect as though fully set forth herein.

89.     This claim arises under the Truth in Lending Act (TILA) and Regulation Z

because it relates to unauthorized and fraudulent credit transactions from Ms. Rivera's BOFA

credit card account.

90.     Defendant violated TILA and Regulation Z.  Defendant's violations include, but

are not limited to: failing to conduct an investigation of Ms. Rivera's claims of error; failing to

provide Ms. Rivera with an explanation for Defendant's denial of Ms. Rivera's fraud claims; and

failing to provide Ms. Rivera with documentation regarding Defendant's denial of Ms. Rivera's

fraud claims, even after Ms. Rivera requested the same.  These actions are in violation of 15

U.S.C. §§ 1643, 1666 and 12 C.F.R. §§ 12 C.F.R. §§ 226.12, 226.13

91.     As a direct and proximate result of Defendant's violations of TILA and

Regulation Z, Plaintiff has sustained actual damages equal to at least $2,308.46 – representing

$1,631.80 in unlawful online advances and withdrawals and $546.44 in fraudulent purchases

plus $130.22 in transfer fees, interest fees, and ATM fees – plus such other damages as may be determined by the court.  Ms. Rivera is entitled to recover actual damages under TILA.  15 U.S.C. § 1640(a)(1).  Because BOFA assessed at least $130.22 in finance charges on Ms. Rivera's accounts, Ms. Rivera is also entitled to recover double the finance charges with a minimum award of $500.  § 1640(a)(2)(A)(iii).  Ms. Rivera is also entitled to recover the costs of the action and a reasonable attorney's fee. § 1640(a)(3).

### THIRD CLAIM FOR RELIEF
(Negligence)

92.     Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs with the same force and effect as though fully set forth herein.

93.     Defendant owed Plaintiff, its customer, a duty of ordinary care.

94.     Defendant breached this duty as follows:

a.   Defendant failed to exercise ordinary care in that it failed to conduct a reasonable investigation of Ms. Rivera's fraud claims, despite the overwhelming evidence that indicated that the cash advances, transfers, withdrawals, and charges in question were committed fraudulently and were not authorized by Ms. Rivera.

b.   Defendant issued only cursory explanations to Ms. Rivera regarding its denial of her fraud claims and failed to provide Ms. Rivera with documentary evidence of the money she allegedly owed.

c.   Defendant failed to exercise ordinary care in that it allowed the transfers, withdrawals, charges cash advances, and other fraudulent activity from and between Ms. Rivera's BOFA accounts.

95.     As a direct and proximate result of Defendant's breach of this duty, Plaintiff suffered compensable harm, including actual damages and emotional distress.

96.     Defendant's conduct was so flagrant as to transcend mere carelessness and constitute willful negligence or recklessness.  Upon information and belief, Defendant has engaged in a pattern and practice of similar behavior against other customers.

97.     As a result, Plaintiff is entitled to actual and punitive damages.

### FOURTH CLAIM FOR RELIEF
(Unjust Enrichment)

98.     Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs with the same force and effect as though fully set forth herein.

99.     Defendant has been unjustly enriched and benefited from the inequitable acts alleged in this Complaint, by its failure to exempt Ms. Rivera from liability for fraudulent and unauthorized activity on her accounts.

100.    Defendant has reaped profits and revenues resulting from its unlawful conduct.

101.    It would be inequitable to allow Defendant to retain any of the proceeds derived from its unlawful conduct.

102.    Defendant should be compelled to disgorge all proceeds received by it for the unlawful acts described in this Complaint which have inured and continue to inure to its unjust enrichment.

-24-

## FIFTH CLAIM FOR RELIEF
(Breach of Contract regarding Ms. Rivera's BOFA credit card agreement)

103.    Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs with the same force and effect as though fully set forth herein.

104.    Defendant entered into a standard credit card account agreement with Ms. Rivera that governed the terms of her credit card account.

105.    The credit card account agreement included a "$0 Liability Guarantee," which guarantees that consumers will not be held liable for fraudulent purchases and payments made by others using their account.

106.    Defendant breached this contract by holding Ms. Rivera liable for the fraudulent cash advances and charges made by an unknown thief or thieves using her credit card account. As a result of Defendant's unlawful actions, Plaintiff incurred damages in an amount to be determined at trial, amounting to at least $2,308.46 in financial losses, plus such other damages as may be determined by the court.

107.    Defendant has reaped profits and revenues resulting from its unlawful conduct.

108.    It would be inequitable to allow Defendant to retain any of the proceeds derived from its unlawful conduct.

109.    Defendant should be compelled to disgorge all proceeds received by it for the unlawful acts described in this Complaint which have inured and continue to inure to its unjust enrichment.

-25-

## SIXTH CLAIM FOR RELIEF
(Breach of Contract regarding Ms. Rivera's BOFA bank account agreement)

110.    Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs with the same force and effect as though fully set forth herein.

111.    Upon information and belief, Defendant entered into a standard bank account agreement with Ms. Rivera that governed the terms of her bank account.

112.    Upon information and belief, the bank account agreement included a similar guarantee that consumers will not be held liable for fraudulent transfers and withdrawals made by others using their account.

113.    Upon information and belief, Defendant breached this contract by holding Ms. Rivera liable for the fraudulent transfers and withdrawals made by an unknown thief or thieves using her bank account.

114.    As a result of Defendant's unlawful actions, Plaintiff incurred damages in an amount to be determined at trial, amounting to at least $2,308.46 in financial losses, plus such other damages as may be determined by the court.

115.    Defendant has reaped profits and revenues resulting from its unlawful conduct.

116.    It would be inequitable to allow Defendant to retain any of the proceeds derived from its unlawful conduct.

117.    Defendant should be compelled to disgorge all proceeds received by it for the unlawful acts described in this Complaint which have inured and continue to inure to its unjust enrichment.

## SEVENTH CLAIM FOR RELIEF
(Breach of Duty of Good Faith and Fair Dealing)

118.    Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs with the same force and effect as though fully set forth herein.

119.    Section 1-203 of New York State's Uniform Commercial Code imposes an obligation of good faith in the performance of any contract.

120.    Section 4-103 of New York State's Uniform Commercial Code further states that no bank may disclaim responsibility for its own lack of good faith or failure to exercise ordinary care in the performance of its obligations.

121.    Furthermore, New York law provides that all contracts contain an implied covenant of good faith and fair dealing in the course of performance.

122.    Defendant breached this duty, and indeed acted in bad faith, by holding Plaintiff liable for the fraudulent and unauthorized cash advances, transfers, withdrawals, and charges on Ms. Rivera's accounts.

123.    As a result of Defendant's breach of the duty of good faith and fair dealing, Plaintiffs are entitled to damages in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:

1.    Enter judgment for Plaintiffs on all causes of action;

2.    Enter an injunction requiring Defendant to comply with the Electronic Fund Transfer Act and the Truth in Lending Act and to train its employees accordingly;

3.    Enter an injunction requiring Defendant to cease and desist from pursuing negative action, including the charging of fees, collection activities, and negative reporting to consumer reporting agencies, as a result of its own failures to comply with the Electronic Fund Transfer Act, the Truth in Lending Act, and its own account agreements;

4.    Award actual, statutory, consequential, and punitive damages to the Plaintiff;

5.    Award reasonable attorney's fees and costs to the Plaintiff; and,

6.    Award such other and further relief as may be just, equitable, and proper.

## JURY DEMAND

Plaintiff respectfully requests a trial by jury.

Dated: Brooklyn, New York
       July 1, 2013

                                        Respectfully submitted,

                                        By: Ricardo N. Avila
                                        One of Plaintiff's Attorneys

Attorneys for the Plaintiff

Ricardo N. Avila
CAMBA Legal Services
Kathleen A. Masters, Esq., Executive Director
885 Flatbush Avenue, 2nd Floor

-28-

Brooklyn, NY 11226
(718) 940-6311 ext. 79255

Matthew A. Schedler
CAMBA Legal Services
Kathleen A. Masters, Esq., Executive Director
885 Flatbush Avenue, 2nd Floor
Brooklyn, NY 11226
(718) 940-6311 ext. 79284

Brian L. Bromberg
Bromberg Law Office, P.C.
40 Exchange Place, Suite 2010
New York, NY 10005
(212) 248-7906